*Chalon Joshua Johnson v. State of Maryland*, No. 0572, September Term 2021, Opinion by Moylan, J.

**HEADNOTES:**

CARROLL DOCTRINE – THE CASE BEFORE US – STANDARD OF REVIEW – THE UNDISPUTED FACTS – THREE SUB-CONTENTIONS – I. PROBABLE CAUSE TO SEARCH FOR EVIDENCE, SYNERGISTICALLY – A. OBSERVATION OF THE MARIJUANA CRUMBS – B. SMELL OF UNBURNED MARIJUANA – C. MUTUAL MULTIPLYING EFFECT OF THE TWO – D. APPELLANT'S CONSCIOUSNESS OF HIS OWN GUILT – E. TINTED WINDOWS AS AN INVESTIGATIVE CLUE – F. A "HIGH CRIME DRUG AREA" – G. *E PLURIBUS UNUM* – THREE BLIND MEN AND AN ELEPHANT: WHAT IS DECRIMINALIZATION? – THERE ARE NO QUANTITATIVE THRESHOLDS FOR EVIDENCE TO BE THE OBJECT OF A CARROLL DOCTRINE SEARCH – A. AN INVESTIGATIVE CLUE NEED NOT BE A LEGALLY SUFFICIENT CASE OF GUILT – B. IN ANY EVENT, IT HAS ALL BEEN SETTLED BY STATUTE – II. PROBABLE CAUSE TO SEARCH FOR CONTRABAND – THE PLENITUDE OF PROBABLE CAUSE – III. THE MALIBU'S MOBILITY – IV. THE SPECIAL PROBLEM OF SCOPE – A. BELL V. STATE – B. CALIFORNIA V. ACEVEDO – C. CITING AUTHORITY VERSUS CHERRY PICKING – D. WHITE VIALS AND BROWN PAPER BAGS AS SPECIFIC TARGETS – E. THE PURPOSE WAS

**ALSO TO SEARCH FOR CONTRABAND – F. "MISSION ACCOMPLISHED" OR "MISSION STILL IN PROGRESS" – V. CONCLUSION**

Circuit Court for Anne Arundel County
Case No. C-02-CR-19-002090

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0572

September Term, 2021

---

CHALON JOSHUA JOHNSON

V.

STATE OF MARYLAND

---

Kehoe,
Leahy,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Moylan, J.

---

Filed: April 4, 2021

*Ripken, Laura S., J., did not participate in the Court's decision to designate this opinion for Publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appellant's omnibus contention and numerous sub-contentions to the contrary notwithstanding, the Carroll[1] Doctrine's status as a well-settled exception to the Fourth Amendment's warrant requirement is alive and well. Its century-old characteristics, moreover, are so comfortably and incontrovertibly ensconced in the caselaw that they do not need to be reinvented before each fresh application. The appellant unleashes a broad fusillade of charges against the State's reliance on the Carroll Doctrine in this case. Not a single shot, however, strikes home.

## The Case Before Us

On his not guilty plea on an agreed statement of facts, the appellant, Chalon Joshua Johnson, was found guilty in the Circuit Court for Anne Arundel County by Judge J. Michael Wachs of 1) the possession of marijuana in an amount exceeding ten grams and 2) the possession of ammunition by one prohibited to possess it. All of the evidence in the case was developed at the pre-trial suppression hearing conducted by Judge Alison L. Asti. Judge Asti denied the appellant's motion to suppress the physical evidence against him. It is that pre-trial suppression hearing that we will be reviewing.

## Standard Of Review

The standard of review is clear. It was plainly set out by the Court of Appeals speaking through Chief Judge Barbera in Raynor v. State, 440 Md. 71, 81, 99 A.3d 753 (2014):

> In reviewing the denial of a motion to suppress evidence, as we do here, we must rely solely upon the record developed at the suppression hearing. We view the evidence and inferences that may be drawn therefrom in the light most favorable to

---

[1] Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

> the party who prevails on the motion, here, the State. We accept the suppression court's factual findings unless they are shown to be clearly erroneous. We, however, make our own independent constitutional appraisal of the suppression court's ruling, by applying the law to the facts found by that court.

(Emphasis supplied.) *See also* Grant v. State, 449 Md. 1, 14-15, 141 A.3d 138 (2016); Hailes v. State, 442 Md. 488, 499, 113 A.3d 608 (2015); State v. Wallace, 372 Md. 137, 144, 812 A.2d 291 (2002).

## The Undisputed Facts

The first-level evidence before Judge Asti was undisputed. This is not surprising because Detective Philip Clarke of the Anne Arundel County Police Department was the sole witness to testify. He explained that at approximately 10 A.M., he and his partner were patrolling in an unmarked police car when they saw the appellant sitting inside his car, a green Chevrolet Malibu. The Malibu was legally parked on Lamplighter Ridge, an area described by Detective Clarke as being a "high-crime drug area," consisting of townhouses.

The detective's partner recognized the appellant from a recent incident in which the appellant "didn't stop his vehicle and fled from the police." On this present occasion, both police officers were wearing their uniforms, which would have been clearly visible through their vehicle's front windshield. As the two officers drove closer to where the Malibu was parked, the appellant looked at them, got out of his car, closed the car door behind him, and ran away on foot. The officers, alighting from their own vehicle, gave chase on foot. They lost sight of the appellant, however, and were unable to catch him.

Both officers then walked back to where the Malibu was parked. It was locked. The windows were rolled up and were tinted. Detective Clarke, however, peered through the

driver's side window and saw "what appeared to be marijuana crumbs" on the driver's seat. He explained that "sometimes when you roll a cigarette blunt, whatever you call it, sometimes the marijuana will fall out. So it looked like he may have been in there previously or had been smoking, so just remnants, just a little bit."

In addition to seeing what he deemed to be marijuana crumbs, Detective Clarke testified that he could also clearly detect the smell of unburned marijuana emanating from the car. He had been trained in detecting the smell of marijuana and he routinely did so as a part of his job. He could readily distinguish the smell of burnt marijuana from the smell of unburnt marijuana. At that point, he called for a back-up to come to the scene. Shortly thereafter, another officer arrived with a "lockout kit," which the police then used to unlock the Malibu. The officers searched the interior of the Malibu. Underneath the driver's seat, they found both a bag containing marijuana and a digital scale. In the bag were 52 grams of marijuana. They continued the search and found ammunition, to wit, five bullets, "stuffed underneath the driver's side panel."[2]

At the suppression hearing, the appellant argued that the marijuana, the digital scale, and the ammunition should all have been suppressed because the warrantless search of his Malibu had been an unconstitutional violation of the Fourth Amendment. The State counter-argued that the warrantless search had been perfectly constitutional pursuant to the

---

[2] The agreed statement of facts at the subsequent trial included the fact that the appellant was prohibited from possessing a firearm or ammunition because of prior convictions.

<u>Carroll</u> Doctrine's exception to the Fourth Amendment warrant requirement. Judge Asti agreed with the State and denied the motion to suppress. This appeal is from that ruling.

## Three Sub-Contentions

The single contention that the <u>Carroll</u> Doctrine was violated breaks down into three distinct sub-contentions:

1. That probable cause was not established to justify the <u>Carroll</u> Doctrine warrantless search of the Malibu;

2. That even if probable cause had been established, the <u>Carroll</u> Doctrine would still not have been satisfied because the Malibu was not readily mobile; and

3. That even if the <u>Carroll</u> Doctrine had otherwise been satisfied with respect to the search for the marijuana, the ammunition should have been suppressed because the extended search that produced it had been excessive in scope.

## I. Probable Cause To Search For Evidence, Synergistically

Deferring for the moment our consideration of the very modest "exigency versus ready mobility" speed bump, we can say with unhesitating confidence that the prime requirement for a warrantless <u>Carroll</u> Doctrine search of an automobile is probable cause to believe that the car contains evidence of crime or contraband. Possibly the single best definition of probable cause was that given by <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

> <u>In dealing with probable cause</u>, however, as the very name implies, <u>we deal with probabilities</u>. These are not technical; <u>they are the factual and practical considerations of everyday life on which reasonable and prudent men</u>, not legal technicians, <u>act</u>. The standard of proof is accordingly correlative to what must be proved. The substance of all the definitions of probable cause is <u>a reasonable ground for belief of guilt</u>. And <u>this means less than evidence which would justify condemnation or conviction</u>, as Marshall, C.J., said for the Court more than a

century ago in <u>Locke v. United State</u>. [Citation omitted]. Since Marshall's time, at any rate, <u>it has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge</u> and of which they had reasonable trustworthy information <u>(are) sufficient</u> in themselves <u>to warrant a man of reasonable caution in the belief that an offense has been or is being committed</u>.

(Emphasis supplied.)

Realistically, our ultimate grasp of probable cause is not so much the product of formal definition but rather the collective wisdom of hundreds upon hundreds of concrete applications. The present case is one such application. It is a case wherein, clue by relentless clue, the accumulation of suspicious behavior would have convinced any prudent and rational observer that skullduggery was afoot. That is the point where mere suspicion ripens into probable cause. The case now before us, moreover, provides far more than just an instance of probable cause. In its profusion of suspicious behavior, it is a textbook example of irrefutable probable cause.

The profusion of suspicious behavior is in significant measure the result of the dynamic phenomenon of synergism. <u>Webster's New Collegiate Dictionary</u> defines "synergism" as "cooperative action of discrete agencies such that the total effect is greater than the sum of the effects taken independently." The profusion of probable cause here resulted from just such an interplay of interacting and reinforcing observations.

## A. Observation Of The Marijuana Crumbs

When the officers abandoned their unsuccessful effort to catch the appellant on foot, they returned to where the appellant's Chevrolet Malibu sat, parked and locked. The first observation made by Officer Clarke, as he peered through the driver's side window, was

"what appeared to be marijuana crumbs" on the driver's seat. The appellant attempts to discredit that observation by pointing out how bad the lighting was and how unilluminating the police effort to photograph the crumbs was. His disdaining attitude suggests that if we cannot confirm the presence of the crumbs visually for ourselves, Detective Clarke's testimony that he could do so becomes both more suspect in terms of credibility and substantively less convincing. To what end does he do this? We are not factfinders and such a dismissive argument falls on deaf ears as a matter of course. The appellant forgets that we are admonished to take that version of the evidence most favorable to the prevailing party, in this case the State. The appellant flagrantly ignores this controlling standard of appellate review.

The detective's testimony about his observation of the marijuana crumbs clearly would have sufficed to justify a ruling of probable cause, had the suppression hearing judge found it necessary to make such a ruling at that point. Judge Asti, however, did not find it necessary to do so. There was more coming and she could afford to wait.

## B. Smell Of Unburned Marijuana

Detective Clarke testified that simultaneously with observing the marijuana crumbs, he also detected what he recognized to be the smell of unburned marijuana. It was on the basis of that combination of observations – one visual and the other olfactory – that he called for back-up and proceeded with the warrantless search of the Malibu. Judge Asti agreed that at that point, probable cause had been established.

There has never been any question about the efficacy, in probable cause assessment, of relying on the olfactory observations of the trained officer just as we have always relied

upon the olfactory observations of the trained drug-sniffing dog.[3] As Justice O'Connor wrote for the Supreme Court in <u>United States v. Johns</u>, 469 U.S. 478, 482, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985):

> <u>After the officer</u> came close and <u>detected the distinct odor of marijuana</u>, they had <u>probable cause to believe that the vehicle contained contraband</u>.

(Emphasis supplied.) *See also* <u>Wilson v. State</u>, 174 Md. App. 434, 441-42, 921 A.2d 881 (2007); <u>State v. Harding</u>, 166 Md. App. 230, 233, 887 A.2d 1108 (2005).

It is undisputed hornbook law that the smelling of marijuana in or emanating from an automobile – by a trained drug-sniffing dog or by a trained police officer – constitutes probable cause to justify a warrantless <u>Carroll</u> Doctrine search of the entire automobile. As this Court pointed out in <u>State v. Funkhouser</u>, 140 Md. App. 696, 711, 782 A.2d 387 (2001):

> In this case there was no disputing the olfactory expertise of the trained and certified cocaine-sniffing canine. <u>When a qualified dog signals</u> to its handler <u>that narcotics are in a vehicle</u>, moreover, <u>that is *ipso facto* probable cause to justify a warrantless Carroll Doctrine search of the vehicle</u>.

(Emphasis supplied.) *See also* <u>Wilkes v. State</u>, 364 Md. 554, 586-87, 774 A.2d 420 (2001); <u>Gadson v. State</u>, 341 Md. 1, 8, 668 A.2d 22 (1995); <u>Timmons v. State</u>, 114 Md. App. 410, 417, 690 A.2d 530 (1997); <u>In Re Montrail M.</u>, 87 Md. App. 420, 437, 589 A.2d 1318 (1991); <u>Snow v. State</u>, 84 Md. App. 243, 248, 578 A.2d 816 (1990).

---

[3] The only difference we have noted between the human sense of smell and the canine sense of smell in terms of their legal significance is that the trained officer can distinguish between the smell of unburned marijuana and that of burnt marijuana and the dog cannot. Perhaps it is the case that the trained dog can, indeed, make that same distinction but has simply not yet learned how to communicate that distinction to us.

## C. Mutual Multiplying Effect Of The Two

As we examine Judge Asti's ruling, that was the point where synergism entered and altered the analysis. It was not the case that the sense of smell added to the sense of sight equaled probable cause. The twin insights into the Malibu's suspicious circumstances were more than incremental. They produced a synergy that went beyond simple addition. We have not simply added the one to the other. The visual observation of the marijuana crumbs would have been enough to justify a ruling that probable cause existed, but it, standing alone, would not have constituted an overwhelming case. Once that visual observation was corroborated by the olfactory observation, however, that visual observation, even as just a visual observation, took on significantly more heft and authority than it had originally enjoyed. By the same token, the subsequent olfactory observation assumed a greater gravitas once it was reinforced by the earlier visual observation.

In the ultimate calibration of probable cause, it was not the case that arithmetically, one plus one equals two. It was rather the case that synergistically, one plus one equals significantly more than two. The whole is, indeed, greater than the sum of its parts. This synergistic enhancement becomes a significant factor whenever defense counsel, in argument, seeks to isolate and to discredit the weight of each constituent factor in a vacuum but conveniently ignores to reckon with the reinforcing impact of multiple factors in combination.

## D. Appellant's Consciousness Of His Own Guilt

In this case, moreover, the synergism did not end with one plus one equaling far more than two. In addition to Detective Clarke's assessment of the double-barreled

probable cause emanating, visually and olfactorily, from the Malibu, we have the additional benefit of the appellant's own assessment of his own guilt. The appellant's flight from the scene immediately upon observing the approach of the police was evidence, inferentially at least, of the appellant's consciousness of his own guilt. What was that guilt? The appellant knew that the Malibu contained 52 grams of marijuana. The appellant knew that the Malibu contained a digital scale for measuring contraband drugs. These both contributed to his awareness of his own guilt. The appellant's flight then communicated, inferentially, his consciousness of the evidence of his guilt lurking in the Malibu.[4]

The appellant's flight in this case could have had significance in yet another specific regard, had it been necessary to turn to it. It was not necessary, however. The appellant seeks, as many defendants do, to capitalize on the fact that the possession of less than 10 grams of marijuana has recently been decriminalized. He makes the point that although an officer may be able to smell marijuana, burnt or unburned, the officer cannot quantify the amount of marijuana that he has smelled. The appellant argues that the marijuana smelled by Detective Clarke might, therefore, have been for only a non-criminal amount. As we shall explore in greater detail infra, that is of absolutely no significance in assessing probable cause for a warrantless Carroll Doctrine search. Were it pertinent, however, the

---

[4]    When the second officer first observed the appellant sitting in the Malibu, he recalled that the appellant had recently also taken off in flight when approached by the police. That observation also was not without some significance in this case. The conclusion that unexplained flight is an indication of consciousness of guilt, of course, is a permitted inference. A permitted inference might be drawn but it might also be declined. In this case the appellant's earlier resort to flight was evidence of his propensity to take to flight as his response to his consciousness of guilt and would have reinforced the case for the drawing of such an inference here on this second occasion.

flight of the appellant from the scene would have taken on even greater significance. As a user and/or distributor of marijuana, the appellant would have been intimately familiar with the marijuana laws. Had the appellant been in possession of less than 10 grams of marijuana, therefore, he would have had no reason to take off in flight. He could have remained in his car and comfortably thumbed his nose at the officers. His very flight, therefore, signaled that he knew that the Malibu contained more than 10 grams of marijuana. His flight, moreover, told the officers that he knew that. His flight itself would have helped to carry the suspicion over the 10-gram threshold, had that been necessary.

Lest the appellant complain that our resort to such a quantitatively precise consciousness of guilt pushes out the envelope of reasoning too far, it behooves us to remind him that we have no choice. On appellate review, we are required to accept that version of the evidence "most favorable to the State's case." In compiling that version of the evidence as carefully and meticulously as we can, we are enjoined to employ not simply the adjective "favorable" but, by way of raising the standard even higher, that adjective in its superlative degree, "**MOST** favorable." Even consciousness of guilt of a civil offense might have been a favorable version of the evidence, but consciousness of guilt of a criminal offense would resonate as the "**MOST** favorable" version. We think that for the appellant's flight to signal to the pursuing police his consciousness of guilt at a quantitatively qualifying criminal level would satisfy our responsibility to accept that version of the evidence "**MOST** favorable" to the State. We, of course, are not permitted to do less. If there were any doubt, moreover, about what "that version of the evidence

10

most favorable to the prevailing party" means, one can always turn to <u>Whiting v. State</u>, 160

Md. App. 285, 300, 863 A.2d 1017 (2004), for helpful guidance:

> It will <u>fully credit the prevailing party's witnesses</u> and discredit the losing party's witnesses. It will <u>give maximum weight to the prevailing party's evidence</u> and little or no weight to the losing party's evidence. It will <u>resolve ambiguities and draw inferences in favor of the prevailing party</u> and against the losing party.

(Emphasis supplied.) That is a standard that a defendant can appreciate only when the

defendant is the prevailing party. *See* <u>State v. Funkhouser</u>, 140 Md. App. 696, 701-03, 782

A.2d 387 (2001).

In assessing possible criminality, the prime investigative guideline is never to look

at a single clue, and never to allow an opponent to argue a single clue, in isolation. Always

keep the focus on the <u>totality</u> of the circumstances! Flight, as indicative of consciousness

of guilt, can at first glance be frustratingly ambiguous. Flight, however, occurs in a context

and that context will frequently clear away some or much of the ambiguity. In this case,

for example, the appellant ran away from a locked car. That alerted the police, at the very

least, to take a look at the locked car. The observation of the marijuana crumbs and the

smell of unburned marijuana, not to mention the tinted windows and the reputation of the

neighborhood as a high drug area, then dispelled any original ambiguity. The appellant's

very behavior helped to portray his sense of guilt with contextual particularity..

**E. Tinted Windows As An Investigative Clue**

As the police arrived back at the parked Malibu, they noticed that the windows of

the car were tinted. In cases such as this, tinted windows appear not infrequently. The tinted

window is typically duly noticed by the court in passing and given minor significance, but

11

seldom more than that. It is worthy, however, of significantly more attention than that. As we now afford window tinting some long overdue attention, we must remember that our subject is not guilt or innocence but only probable cause. We are not concerned with what a juror might accept as evidence of ultimate guilt but only with what a trained detective should notice as an investigative lead worth pursuing further. On the issue of probable cause, we are concerned only with a clue's value as a clue.

The tinting of automobile windows is not the norm.[5] It is legal, of course, but at least statistically unusual. Its purpose of affording automobile passengers a modicum of increased privacy, albeit legal, can nonetheless tell a good investigator something about the personality of the person desiring the increased privacy. Such investigative curiosity, of course, is also legal. It is, after all, a vehicular version of wearing a mask. Such person, of course, might be a celebrity seeking only to avoid the prying eye of the paparazzi – or

---

[5]    The opinion of the Court of Appeals in State v. Williams, 401 Md. 676, 934 A.2d 38 (2007) and the opinion of this Court in Baez v. State, 238 Md. App. 587, 192 A.3d 945 (2018) dealt with the tinting of automobile windows not as an aspect of probable cause to believe that narcotics laws were being violated, but as possible substantive violations of the traffic law based on the degree of the tinting. Judge Raker's opinion for this Court in Baez, however, pointed out that the Maryland anti-tinting regulations were enacted in 1995 and that Maryland is one of twenty-eight states that "have now enacted laws either regulating or altogether prohibiting the use of tinted windows on vehicles in their state." 238 Md. App. at 596. Our opinion also explained that officer safety was a primary reason for the enactment of the anti-tinting regulations:

> From the legislative history of the statute, we glean that the primary, underlying purpose of the statute was that because excessively tinted windows prevent officers from perceiving dangers or problems inside the vehicle, the legislation was necessary to protect the safety of law enforcement officers who stop and approach a vehicle.

238 Md. App. at 595

the hoopla of curious onlookers. Such person might be one with a sensitive eye condition, trying to avoid the glare of the sun. Such person could also, on the other hand, be a criminal, seeking to avoid the probing curiosity of the police. Or such person could, yet again, simply be anyone looking for enhanced privacy for any reason. Knowing the reason for the desired privacy, however, can tell a trained investigator a lot about the personality of the person seeking that enhanced privacy.

At this point, the tinted window, though intended visually to be less illuminating, can be figuratively very illuminating by illustrating the value of looking at the totality of the circumstances. In a vacuum, the tinted window may tell us nothing about the automobile owners or about why they desire the enhanced privacy. Tinted windows, however, are seldom found in vacuums. They are found in the concrete contexts of real cases. The answer to the investigator's curiosity will frequently be found in that context. At first approach to this quest for the reason for the desired enhanced privacy, we may not know whether we are dealing with Greta Garbo or with Don Vito Corleone. The context, however, can quickly narrow that range of probabilities considerably.

In the present case, the police may have been told little by the tinted window alone. Combine it with one other fact, the observation of marijuana crumbs on the driver's seat, and the range of possibilities immediately narrows dramatically. Combine it with yet a second additional fact, the smell of unburnt marijuana, and any remaining mystery becomes non-existent. Combine it with yet a third fact, the appellant's precipitate flight upon the approach of the police, and even to surmise about a privacy-seeking Greta Garbo or Princess Diana becomes an absurdity. The fourth additional factor, the general character

13

of the neighborhood as a high crime area focused largely on narcotics, is merely a gilding of the lily. At that point, there was nothing left to add to the picture. In full context, which is the only way to look at it, our appraisal of the unilluminating tint of the Malibu's windows has been vividly illuminating.

The tinted window, as an abstraction in a vacuum, may speak with a softly modulated voice. In the glorious totality of its full context, however, it may speak volumes. Whatever value a tinted window may have as proof of ultimate guilt is not, of course, the issue before us. On the antecedent issue of probable cause, we need only ask, "Is it a good investigative clue?" Of course it is. It may be a critical element of probable cause.

## F. A "High Crime Drug Area"

Simply to set this entire totality of circumstances in its proper geographic context, the Malibu, when searched, was parked on Lamplighter Ridge, described by Detective Clarke as a "high crime drug area." Once again, standing alone that might not have critical significance. Synergistically, however, it helps to fill out and to give interpretive tone to the total picture.

In Bell v. State, 96 Md. App. 46, 53, 623 A.2d 690 (1993), this Court observed how the character of the neighborhood in which an event occurs can raise the level of suspicion as to the event itself. Bell's comment about "immediate dispersal," moreover, would certainly apply to the precipitate flight from the scene of the appellant in this case.

> The neighborhood was known to the police as one with a high level of drug activity. The appellant was one of four or five young males who immediately dispersed at the approach of strangers, quite possibly the police.

(Emphasis supplied.)

14

When the issue before us is not guilt or innocence but only probable cause, <u>State v. Johnson</u>, 458 Md. 519, 541, 183 A.3d 119 (2018) well states the pivotal criterion as "circumstances sufficiently suspicious to warrant further investigation:

> The stop occurred in <u>a high-crime area</u>, a relevant contextual consideration that an officer is not required to ignore when determining <u>whether the circumstances are sufficiently suspicious to warrant further investigation</u>.

(Emphasis supplied.) *And see* <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

In assessing the Fourth Amendment reasonableness of the police response, the geography of the encounter can be critically important. In terms of its exposed vulnerability, the abandoned Malibu here, probably containing an undetermined quantity of illegal drugs, sat helplessly amid an opportunistic crowd of drug users and drug peddlers. It was not resting quietly somewhere in the outback of rural Finland. All else being equal, a difference in geographic setting can make a critical difference in level of suspicion and also in level of vulnerability.

A word is in order about the Malibu's location. Initially, the possibility that the appellant was parked in the middle of a drug market in order to sell drugs was no more than one random possibility in an open-ended cornucopia of random possibilities. Standing alone, it would not achieve critical mass. That is why it is necessary to examine, one by one, every circumstance in the totality of the circumstances to see if that narrows the range of possibilities. In this case, each of four separate sets of circumstances did, indeed, narrow that range. What began as a mere random possibility ripened into a significant probability.

In discussing location, we should not even be talking about a green Chevrolet Malibu parked on Lamplighter Ridge. We should only be talking about a green Chevrolet Malibu with tinted windows and marijuana crumbs on the driver's seat, emitting the smell of unburned marijuana and from which the driver had fled precipitously upon the approach of the police, sitting in a "high crime drug" area. Only that full context permits a meaningful assessment of that car in that location at that time. A car with a story to tell is a far more reliable witness when left unsterilized. It was no longer just a green Chevrolet Malibu parked on Lamplighter Ridge.

## G. *E Pluribus Unum*

After having tried as carefully and meticulously as we know how to set out and to describe these five separate tributaries of suspicious behavior that synergistically all joined together to form the main stream of probable cause, we are chagrined that the appellant, in his brief, can completely ignore four of the five as if they did not exist:

> The question in issue in this case is whether police may search a car, and if so, the permitted scope of that search, where the sole basis for probable cause is that the car smells like marijuana.[6]

(Emphasis supplied.)

---

[6]     Is the appellant even suggesting that the permitted scope of a resultant Carroll Doctrine search might, on some yet uninvented sliding scale, fluctuate upward or downward depending upon the relative strength of the generative probable cause? Stronger probable cause supporting a more intensive investigation? Weaker, albeit adequate, probable cause supporting only a more inhibited investigation? Would the measurable levels of authorizing probable cause, moreover, be limited to two? Or might there be an intermediate third level? Or even a fourth level? Such a sliding scale for the permitted scope or intensity of searches and seizures, as opposed to a simply binary "yes or no," would seem to entail a massive rewriting of the entire Fourth Amendment. For the moment, however, probable cause either is or is not.

16

Once the Ohio River, below Cairo, flows into the Mississippi, one can no longer analyze Ohio River water as a distinct entity separate from its newer and larger totality. That earlier and partial identity no longer exists. We conclude this section of the opinion by reaffirming that the fact "that the car smelled like marijuana" was by no means "the sole basis for probable cause" in this case. As a mandatory standard of review, we must assess the totality of the circumstances and not a single factor in isolation. Surely, the marijuana crumbs on the driver's seat, the precipitate flight of the appellant, the tinting of the car windows, and the character of the neighborhood counted for something. They may not be conveniently ignored. The smell of marijuana was obviously not "the sole basis for probable cause."

If the parties were competing, persuasively, on a level playing field, the appellant might make such an argument. They are not, however, competing on a level playing field. As we have repeatedly explained, on appellate review of a suppression hearing ruling, we are enjoined to take that version of the evidence "**MOST** favorable" to the State's case. The appellant, incongruously, urges upon us a version of the evidence "**LEAST** favorable" to the State's case, ignoring the marijuana crumbs, the tinted windows, the sudden flight of the appellant, and the character of the neighborhood. He does not even attempt to reconcile his summary of the evidence with the controlling standard of appellate review. He urges upon us a version of the evidence that is irrelevant. The appellant does not even try to suggest how four other sets of suspicious circumstances, all in addition to and corroborative of the smelling of the marijuana, can be utterly eliminated from that "**MOST**

17

favorable" version of the evidence. They cannot be eliminated, of course, and the argument is patently spurious.

## Three Blind Men And An Elephant: What Is Decriminalization?

"Aha," said a blind man touching the side of an elephant, "so an elephant is like a wall. "On, no," said the second blind man touching the leg of the elephant, "an elephant is like a tree." "You are both wrong," said the third blind man touching the tail of the elephant, "an elephant is like a snake." Just such an elephant is now codified in the Criminal Law Article of the Maryland Code at Sections 5-601 and 5-601.1. How shall we describe that elephant? Single characteristic by single characteristic? Or in its totality? We must first reject the partial description urged upon us by the appellant. His skewed perception, inevitable because of his obsessive focus on a single characteristic of a much larger totality, would seem to qualify him as a fourth blind man joining the classic trio in the ancient Indic fable, none of whom could see the forest because of the trees.

Notwithstanding both unambiguous statute law and extensive State and national caselaw universally to the contrary, the appellant doggedly persists in chanting a mantra of decriminalization that has been completely discredited. Or should have been! Early in his brief, he asserts his basic legal position:

> When a search is based on <u>the smell of marijuana, which has recently become legal to possess in certain quantities</u>, the <u>police's powers</u> under <u>Carroll</u> and its progeny <u>should be narrowed</u>.

(Emphasis supplied.) The appellant does not deign to tell us what those diminished or "narrowed" police powers under the <u>Carroll</u> Doctrine should be, let alone how we should presume to narrow federal constitutional law.

Farther along in his brief, the appellant sought to distinguish <u>Wilson v. State</u>, 174 Md. App. 434, 921 A.2d 881 (2007). He did so by pointing out that:

> <u>*Wilson* was decided long before marijuana possession was decriminalized</u>. Maryland has yet to directly reckon with <u>whether police may look in every nook and cranny of a vehicle</u>, and even tear it apart, <u>because they smell something that it is no longer a crime to possess</u>.

(Emphasis supplied.) The appellant does not suggest how the intensity of the searching process might have been affected. Might the police, because of decriminalization, have retained the authority to look into the car generally but have lost the authority to look into "every nook and cranny?"

The third drumbeat of irrelevancy was purely gratuitous:

> Exhaustive, sometimes damaging <u>searches</u> of parked, locked, unoccupied cars <u>simply because police claim they smell marijuana, which a citizen may now possess without committing a crime, are unreasonable</u>.

(Emphasis supplied.) If "exhaustive" searches are now "unreasonable," why are not cursory searches equally "unreasonable?"

The appellant's final intoning of his decriminalization mantra does inadvertently expand significantly the sweep of the actual decriminalization:

> Again, <u>given that</u> <u>marijuana is no longer a crime to possess</u>, the reasonableness of expansive *Carroll* <u>searches of</u> parked, locked, and unoccupied <u>vehicles based on its smell should be viewed differently. Such searches are unreasonable</u>.

(Emphasis supplied.)

This tendency of defendants and of defense counsel to overread, stubbornly and massively, the significance of Chapter 158 of the Acts of 2014 is necessary to counteract. The appropriate way to begin would be by simply reading the Act itself, now codified as Maryland Code, Criminal Law Article, Sect. 5-601 itself. Subsection 5-601(a) sets out the illegal behavior that is broadly prohibited:

(a) Except as otherwise provided in this title, <u>a person may not</u>:

(1) <u>possess</u> or administer to another <u>a controlled dangerous substance</u>, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice.

(Emphasis supplied.)

Subsection 5-601(a)(2) goes on to prohibit the attempt to obtain or to administer a Controlled Dangerous Substance. The section does not distinguish between marijuana and any other Controlled Dangerous Substance. Nor does the section make any distinction between some greater amount and some lesser amount of marijuana. The prohibition applies to all Controlled Dangerous Substances, including marijuana and regardless of the amount.

It is only in Subsection 5-601(c) that the act moves to the applicable penalties for adjudicated violations of the act. Subsection (c)(1) sets out the penalties for violations involving Controlled Dangerous Substances other than marijuana. Subsection (c)(2) sets out the penalty for the use or possession of marijuana generally, imprisonment not exceeding 6 months or a fine not exceeding $1,000 or both. It is only in Subsection (c)(2)(ii) that the act turns to the "penalties" for "findings of guilt" involving the use or possession of less than 10 grams of marijuana:

20

1. A first finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $100.

2. A second finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $250.

3. A third or subsequent finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $500.

(Emphasis supplied.) These "findings of guilt" and these resultant fines, as "punishment," are not imposed for legal behavior.

Subsection (c)(ii)(4) goes on to direct that the court may also commit a defendant "found guilty of a violation" involving less than 10 grams of marijuana 1) to attend drug education, 2) to be referred for an assessment of substance abuse disorder, and 3) to receive substance abuse treatment if necessary.

The only slight solace a defendant can take from this post-2014 law governing the use or possession of less than 10 grams of marijuana is in Sect. 5-601.1(b) which provides:

(1) A violation of §5-601 of this part involving the use or possession of less than 10 grams of marijuana is a civil offense.

(2) Adjudication of a violation under §5-601 of this part involving the use or possession of less than 10 grams of marijuana:

(i) is not a criminal conviction for any purpose; and

(ii) does not impose any of the civil disabilities that may result from a criminal conviction.

(Emphasis supplied.)

21

Section 5-601.1 goes on to provide, however, that a police officer shall issue a citation to one who has violated the Controlled Dangerous Substances law even by way of committing such a civil offense. A violator under the age of 21 years or an older violator who has two prior convictions for violating this law has no fine prepayment option and will be summoned to appear for trial.[7] One does not stand trial for lawful behavior. One is not fined for lawful behavior.

Section 5-601.1 also spells out the procedure for the trial in the District Court of this civil offense which it labels as "Code violation under Sect. 5-601." Subsection (i)(2) provides:

> The court shall apply <u>the evidentiary standards as prescribed by</u> law or rule <u>for the trial of a criminal case</u>.

(Emphasis supplied.) For one found to have committed this civil offense, "<u>the verdict of the court</u> shall be…<u>guilty of a Code violation</u>." Subsection (k)(1) further provides:

> <u>The State's Attorney</u> for any county <u>may prosecute a Code violation</u> under § 5-601 of this part involving the use or possession of less than 10 grams of marijuana <u>in the same manner as prosecution of a violation of the criminal laws of the State</u>.

(Emphasis supplied.)

After the use or possession of less than 10 grams of marijuana was made a civil offense in 2014, the first Maryland appellate opinion to deal with the new law was Judge

---

[7] We do note several interesting features of a trial for a civil offense in contrast to a trial for a criminal offense. In both instances, the prosecution of the case is entrusted to the State. In the trial of the civil offense, however, the burden of persuasion imposed upon the State is only that of proof by a preponderance of the evidence as opposed to proof beyond a reasonable doubt. In the trial of the civil offense, moreover, the defendant is entitled to the assistance of counsel. Counsel, however, is not provided at State expense. Sect. 5-601.1 (i) (1 and 5).

Graeff's for this Court in <u>Bowling v. State</u>, 227 Md. App. 460, 134 A.3d 388 (2016). That opinion made it clear at the outset that the possession of less than 10 grams of marijuana remains illegal:

> This statutory language makes clear that, although the legislation enacted in 2014 decriminalized the possession of less than 10 grams of marijuana, it remains a civil offense, and therefore, <u>it still is illegal</u>. <u>Decriminalization is not synonymous with legalization</u>.

(Emphasis supplied.) 227 Md. App. at 470. Our opinion, 227 Md. App. at 476, concluded, "<u>[I]t is still illegal to possess any quantity of marijuana</u>." (Emphasis supplied.)

Within less than a year, the Court of Appeals in <u>Robinson v. State</u>, 451 Md. 94, 152 A.3d 661 (2017) affirmed that illegal status of the possession of any amount of marijuana:

> Simply put, <u>decriminalization is not synonymous with legalization, and possession of marijuana remains unlawful</u>.

(Emphasis supplied.) 451 Md. at 99. Judge Watts's thorough opinion for the Court, 451 Md. at 125, indisputably held that the possession of marijuana in any amount remains illegal in Maryland:

> Our logic is straightforward. <u>Decriminalization is not the same as legalization</u>. Despite the decriminalization of possession of less than ten grams of marijuana, <u>possession of marijuana in any amount remains illegal in Maryland</u>. To be sure, the amended marijuana statute changed the categorization of, and maximum penalty for, possession of less than ten grams of marijuana. Specifically, <u>possession of less than ten grams of marijuana is now categorized as a civil offense</u> rather than a crime, <u>and it is punishable by a fine, participation in a drug education program, an assessment for substance abuse disorder, and possible substance abuse treatment</u>, rather than a fine and/or a period of incarceration. Decriminalization notwithstanding, however, <u>the possession of less than ten grams of marijuana – i.e. the possession of any amount of marijuana – remains illegal</u>.

(Emphasis supplied.)

23

The bottom line is that, contrary to the interpretation of Sect. 5-601.1 solemnly urged upon us by this appellant and by others, a finding of guilty of a Code violation of Sect. 5-601 has definitely not received the Goodhousekeeping Seal of Approval. The possession or use of marijuana in any amount has not become normal and proper behavior. It is illegal. One may not be issued a citation by the police for, be summoned to trial for, be found guilty of, be punished by a fine of up to $500 for, be assessed for a substance abuse disorder for, and be subjected to substance abuse treatment for behavior that is legal and proper. To suggest otherwise is a disingenuous resort to Orwellian nonsense. It is a blatant sugarcoating of flagrant illegality. Less than 10 grams of marijuana, moreover, remains seizable contraband. So, for that matter, does one gram of marijuana.

It is a sheer torture of language to suggest that the possession or use of less than 10 grams of marijuana is "inoffensive." No less than half a dozen Praetorian sanctions now sternly guardrail this newly created "civil offense." The General Assembly chooses its words carefully and deliberately. It is nothing less than Orwellian Newspeak[8] to conclude that the Legislature would take conduct that it deems to be completely inoffensive and would then officially denominate such conduct as an "offense," civil or otherwise. It is an oxymoron to say that one can be found "guilty" of being inoffensive.

One might as readily praise a defendant convicted of petty larceny for not being as guilty as one whose theft had reached the requisite threshold for grand larceny. Is there much of a moral distinction between the grand possession of marijuana and the petty

---

[8]    George Orwell, Nineteen Eighty-Four (1949).

24

possession of marijuana? It is not a badge of honor that for the last 500 years the status of petty larceny has been downgraded to the level of being non-felonious. A "verdict of guilty" for the lesser or petty offense does not earn one a laurel wreath.

All of this analysis of the 2014 change in the law, of course, is intended simply to dampen the ardor of the appellant's "Decriminalization" protest. The difference between the use or possession of 10 grams or more of marijuana and the use or possession of less than 10 grams of marijuana may be important for the trial on the merits. It has absolutely nothing to do with the antecedent issue of probable cause for a search and seizure. In this case, moreover, the appellant was actually found to have been in possession of 52 grams of marijuana, not less than 10 grams. The digital scale, moreover, suggests that he may have been more than a user. The appellant is simply waving the 2014 downscaling of the verdict and punishment as some sort of libertarian banner. One must, however, identify the barricades. The libertarian banner may not be out of place at a trial on the merits. It is definitely a discordant display at a suppression hearing.

## There Are No Quantitative Thresholds
## For Evidence To Be The Object Of A <u>Carroll</u> Doctrine Search

On the suppression issue which is before us, the appellant continues to try to exploit the 2014 change in Maryland law that reduced the use or possession of less than 10 grams of marijuana to a civil offense. He argues that the smell of marijuana in a car by a trained officer (or by a dog) cannot be quantified as to the amount that was smelled. From this he goes on to argue that the amount of marijuana that was smelled may have been less than 10 grams, which in and of itself is no longer a criminal offense. Therefore, his argument

25

concludes, probable cause does not exist to believe that what was smelled was evidence of a crime. This argument fails utterly for three separate and independent reasons. In Pacheco v. State, 465 Md. 311, 328, 214 A.3d 505 (2019), the Court of Appeals held clearly:

> [F]or purposes of probable cause in the context of vehicle searches, there is no distinction between the significance of a criminal amount of marijuana versus the significance of a noncriminal – but still illegal – amount of marijuana.

(Emphasis supplied.)

## A. An Investigative Clue Need Not Be A Legally Sufficient Case Of Guilt

The entire phenomenon of probable cause deals with investigative clues and with heightened suspicion, not with the proof at trial of a legally sufficient case of guilt. There is no burden of production required to proceed with a reasonable investigation. During the investigative stage, the detection of "some" inculpatory suspicion, by any of the senses, leads the prudent investigator reasonably to suspect that there may be "more." That is why the smell of marijuana in any amount in a vehicle has always led to a permitted search of the entire vehicle, frequently including a locked trunk. We ask of a good and possibly productive clue no more than this. We are reviewing only the reasonableness of an investigation, not the reasonableness of a conviction.

For a reasonable Carroll Doctrine search of an automobile, two categories of things are proper objects of the search. One of these is "contraband," (of which much more anon). The other is "evidence of crime." Evidence of crime means some evidence, not legally sufficient proof of guilt. Posit a case where the sum total of marijuana recovered from a defendant's car is a mere five grams. Posit further, however, the production at trial of an additional five grams of marijuana taken from a defendant during a search incident of his

26

person or yet another five grams taken from a bag or suitcase in his possession or even an additional five grams abandoned by him in a field or in a dumpster. The necessary 10 gram threshold for trial purposes might easily have been met by some combination of those 5-gram increments. The product of the <u>Carroll</u> Doctrine search need only have been a small part of that ultimate totality. Even a single 5-gram increment would have been self-evidently some "evidence" contributing to the proof of guilt. Evidence of crime is not necessarily self-sufficient evidence of guilt.

Evidence of crime is evidence of crime in any amount. A small amount of gold dust downstream of a mountain may set off a gold rush to the mountain. Probable cause to believe that there was one gram of marijuana in a car would be constitutional justification for a warrantless <u>Carroll</u> Doctrine search of the entire vehicle. One gram is some "evidence." The ultimate burden of production may be satisfied by combining various bits of "some evidence." "Some evidence" may be searched for upon probable cause that it exists. The <u>Carroll</u> Doctrine's "evidence of crime" requirement, therefore, contemplates some relevant evidence (perhaps no more than a lead pointing the way to other evidence). It does not contemplate a cache of evidence legally sufficient in and of itself to support a trial verdict of guilty. The appellant's argument, however, does not pursue this issue of unquantifiable "evidence of crime" beyond intoning the familiar mantra and again waving the libertarian banner.

In <u>Robinson v. State</u>, 451 Md. 94, 152 A.3d 661 (2017), Judge Watts explained that the smelling of marijuana in any amount still constitutes probable cause to search a vehicle for "evidence of a crime." Even if the mere possession or use of less than 10 grams of

marijuana may have been decriminalized, the distribution of less than 10 grams of marijuana remains a crime as does driving under the influence of less than 10 grams of marijuana. At 451 Md. 133-34, Judge Watts explained:

> Despite the decriminalization of possession of less than ten grams of marijuana, the odor of marijuana remains evidence of a crime. The odor of marijuana emanating from a vehicle may be just as indicative of crimes such as the possession of more than ten grams of marijuana, possession of marijuana with the intent to distribute, or the operation of a vehicle under the influence of a controlled dangerous substance, as it is of possession of less than ten grams of marijuana. In short, possession of ten grams or more of marijuana, crimes involving the distribution of marijuana, and driving under the influence of a controlled dangerous substance have not been decriminalized in Maryland, and, thus, the odor of marijuana emanating from a vehicle provides probable cause to believe that the vehicle contains evidence of a crime, and a law enforcement officer may search the vehicle under such circumstances.

(Emphasis supplied.)

Chief Judge Barbera's recent opinion for the Court of Appeals in Pacheco v. State, 465 Md. 311, 214 A.3d 505 (2019) is an invaluable teaching aid to distinguish between the lesser amount of marijuana that must probably be present to support a warrantless search of a defendant's automobile and the greater amount of marijuana that must probably be present to support the arrest of the appellant and its attendant search incident. As Chief Judge Barbera's opinion concluded, 465 Md. at 333:

> The same facts and circumstances that justify a search of an automobile do not necessarily justify an arrest and search incident thereto.

(Emphasis supplied.)

Probable cause to arrest Pacheco depended upon the probable presence of enough marijuana (10 grams or more) to establish his actual guilt of a crime. The 10 grams threshold was of critical importance for that purpose. Probable cause to conduct a

28

warrantless search of his car for evidence, on the other hand, depended upon a showing of no such quantifiable threshold. For that lesser purpose, the 10 gram threshold was not significant:

> The facts presented by the State and credited by the hearing judge were sufficient to establish probable cause to search the vehicle based on the presence of contraband. However, little else was presented that addressed why this minimal amount of marijuana, which is not a misdemeanor, but rather a civil offense, gave rise to a fair probability that Mr. Pacheco possessed a criminal amount of marijuana on his person.

465 Md. at 333. (Emphasis supplied.)

In the Pacheco case, as here, the police detected the smell of marijuana coming from a vehicle. At the suppression hearing, the State argued that "the odor provided probable cause to search both the vehicle and the defendant." 465 Md. at 318. The Court of Appeals rejected that equivalency. It explained that it was being called upon to examine probable cause for two distinct law enforcement purposes:

> This case gives rise to consideration of two exceptions to the warrant requirement of the Fourth Amendment: the so-called automobile exception announced in Carroll v. United States (1925) and the search incident to arrest exception announced in Chimel v. California (1969).

465 Md. at 321. (Emphasis supplied.) The Court of Appeals quoted extensively from 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, Sect. 3.1(b)(5th ed. 2012), p. 7:

> The probable cause determinations for the automobile exception and the search incident to lawful arrest exception are not in all respects identical. Although the probable cause determination for each of these exceptions requires the same quantum of evidence, each requires a showing of probabilities as to somewhat different facts and circumstances – a point seldom made explicit in the appellate cases. This distinction is a critical one, and there may be probable cause to search without probable cause to arrest, and vice-versa.

29

465 Md. at 324-25. (Emphasis supplied.) The Court of Appeals went on to pose the distinction in its own terms:

> When determining <u>whether probable cause exists for purposes of the automobile exception, courts ask whether there is probable cause to believe the vehicle contains contraband or evidence of a crime</u>. However, <u>before a person can be lawfully arrested and searched incident thereto the focus must be on the likelihood of the guilt of the arrestee. In the search context, the question is whether</u> the totality of circumstances is sufficient to warrant a reasonable person to believe that <u>contraband or evidence of a crime will be found</u> in a particular place. Whereas <u>in the arrest context, the question is whether</u> the totality of the circumstances indicate to a reasonable person that <u>a suspect has committed</u>, is committing, or is about to commit <u>a crime</u>.

465 Md. at 325. (Emphasis supplied.)

Chief Judge Barbera's opinion went on to explain the reason for the distinction between the probable cause necessary to search an automobile for additional evidence and the probable cause necessary to arrest a human being:

> <u>The distinction between the two exceptions is at least in part due to the diminished expectation of privacy that justifies the automobile exception</u> as compared to the unique, significantly heightened constitutional protections afforded a person to be secure in his or her body.

465 Md. at 325-26. (Emphasis supplied.)

The latter investigative step, one wherein the 10 gram threshold is critical, involves the actual beginning of the prosecution of an individual based on probable cause to believe that he was actually guilty of a crime. The former step, by contrast, only justifies further investigation to determine whether the suspected crime was ever actually committed:

> Thus, <u>the mere odor of marijuana emanating from a vehicle provides probable cause that the vehicle contains additional contraband or evidence of a crime</u>, thereby permitting the search of the vehicle and its contents.

30

465 Md. at 329. (Emphasis supplied.) Probable cause to conduct a further search of an automobile for evidence and probable cause to arrest an individual for a consummated crime serve two very different purposes:

> It does not follow, however, that because the police lawfully searched Mr. Pacheco's car for contraband or evidence they likewise had the right to search his person.

465 Md. at 330. (Emphasis supplied.) The probable cause that justified the Carroll Doctrine search of Pacheco's car was not probable cause to justify the arrest (and subsequent search incident) of Pacheco:

> They also testified to their detection of fresh burnt marijuana emanating from the vehicle and the joint they observed in the center console. These facts, without more, do not meet the standard for probable cause to arrest and thereby to search Mr. Pacheco.

465 Md. at 332. (Emphasis supplied.)

The fact that in that case the probable cause of evidence being present in the Chevrolet Malibu never necessarily crossed the new 10 gram threshold was absolutely immaterial for Carroll Doctrine purposes. On the other hand, it could not have justified Pacheco's arrest and it did not. It could, however, have justified the search of his car and it did. The latter is all that is necessary in the present case. It was, in any amount, a good clue and that is all that the Carroll Doctrine requires for a finding of probable cause. A good clue, to be sure, is not a legally sufficient case. Those who, like the appellant here, insist that probable cause requires that the officer shall have smelled 10 grams or more of marijuana are arguing that probable cause means no less than a legally sufficient case at trial. They are imposing a trial requirement on a pre-trial investigation. They are imposing an ultimate and heavy burden of production on an investigative clue. They may not do so.

31

## B. In Any Event, It Has All Been Settled By Statute

All of this, in the last analysis, is an unnecessary and redundant argument. The 2014 change in the law that lowered the status of the use and possession of less than 10 grams of marijuana to that of a civil offense did not stop there. It went on to settle in unequivocal terms the search and seizure question before us here. Sect. 5-601(d) clearly provides:

> The provisions of subsection (c)(2)(ii) of this section making the possession of marijuana a civil offense may not be construed to affect the laws relating to:
>
> 1.  operating a vehicle or vessel while under the influence of or while impaired by a controlled dangerous substance; or
>
> 2.  seizure and forfeiture.

(Emphasis supplied.) Q.E.D. In Maryland the search and seizure law post-2014 remains precisely what it was pre-2014. It remains, as it always was, reasonable and constitutional.

## II. Probable Cause To Search For Contraband

The Carroll Doctrine, it must not be forgotten, is a double-barreled investigative weapon. The focus of its gunsight is two-fold. The investigative object of the search of an automobile or automobile equivalent is not simply to discover evidence of crime. The cross-hairs are also trained, independently and distinctly, on the discovering, seizing, and confiscating of contraband. That, in its own right, is an independent justification for a Carroll Doctrine search of a vehicle. Quite aside from probable cause to search for evidence of crime, the Carroll Doctrine authorizes the police to search for contraband.

If at this point every line thus far written in the course of this opinion were to be erased as wrongfully reasoned and if the State were to submit a binding concession that there was not a shred of probable cause to suspect that the appellant's Chevrolet Malibu

32

contained any "evidence of crime," the warrantless <u>Carroll</u> Doctrine search under review would still pass muster on totally separate and independent grounds. We could simply hold that the police had probable cause to believe that the appellant's Malibu contained contraband, and say no more. The 10-gram threshold on the possession of marijuana has no significance in the definition of contraband.

Lest any might for a moment think that the search for contraband is a mere afterthought or tag-along to the <u>Carroll</u> Doctrine's core purpose of searching for evidence of crime, the reality is diametrically otherwise. The <u>Carroll</u> Doctrine, of course, has been with us for 97 years. Chief Justice William Howard Taft's opinion, however, revealed that its more distant rumblings and its earliest energizing rationale had been marinating for a full 135 years before 1925. From the very dawn of the Republic, warrantless searches of wagons, boats, carts, and sleds had been constitutionally permitted in the search for contraband. It was the search for evidence of crime that later came along as the almost incidental afterthought. <u>Carroll v. United States</u> itself, 267 U.S. at 153, revisited the pedigree:

> Thus <u>contemporaneously with the adoption of the Fourth Amendment we find</u> in the First Congress, and in the following Second and Fourth Congresses, <u>a difference made as to the necessity for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of reach of a search warrant</u>. Compare <u>Hester v. United States</u>, 265 U.S. 57, 44 S.Ct. 445, 68 L.ED. 898.

> Again, <u>by</u> the second section of <u>the Act of March 3, 1815</u>, 3 Stat. 231, 232, <u>it was made lawful for customs officers</u>, not only to board and search vessels within their own and adjoining districts, but also <u>to stop, search, and examine any vehicle, beast, or person on which or whom they should suspect there was merchandise which was subject to duty or had been introduced into the United States in any manner contrary</u>

33

to law, whether by the person in charge of the vehicle or beast or otherwise, <u>and if they should find any goods, wares, or merchandise thereon, which they had probable cause to believe had been so unlawfully brought into the country, to seize and secure the same</u>, and the vehicle or beast as well, for trial and forfeiture. <u>This act was renewed April 27, 1816</u> (3 Stat. 315), for a year and expired. The Act of February 28, 1865, revived section 2 of the Act of 1815, above described, 13 Stat. 441, c. 67. <u>The substance of this section was re-enacted in the third section of the Act of July 18, 1866</u>, c. 201, 14 Stat. 178, and was thereafter embodied in the Revised Statutes as section 3061 (Comp. St. §5763). <u>Neither section 3061 nor any of its earlier counterparts has ever been attacked as unconstitutional</u>.

(Emphasis supplied.)

Chief Justice Taft, 267 U.S. at 153, thus laid out the antecedent DNA of what became the <u>Carroll</u> Doctrine:

<u>We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing</u> a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and <u>a search of a ship, motor boat, wagon, or automobile for contraband goods</u>, where it is not practicable to secure a warrant, <u>because the vehicle can be quickly moved out of the locality</u> or jurisdiction in which the warrant must be sought.

(Emphasis supplied.)

It was this search for contraband that gave birth to the <u>Carroll</u> Doctrine. It behooves us periodically to keep this proper order of seniority in mind. The search for contraband is actually the senior partner. Judge Barbera (later Chief Judge of the Court of Appeals) wrote for this Court in <u>Berry v. State</u>, 155 Md. App. 144, 176, 843 A.2d 93 (2004), as she pointed out the dual or twin purpose of a warrantless <u>Carroll</u> Doctrine search of a vehicle:

The United States Supreme Court, in a series of cases harkening back almost 80 years, has recognized an exception to the warrant requirement that allows the police, when they have <u>probable cause to believe a vehicle contains contraband or evidence</u>

34

of a crime, to search the vehicle for that contraband or evidence of a crime and seize it, without a warrant.

(Emphasis supplied.)

In Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court described probable cause as a "fair probability that contraband or evidence of a crime [would] be found in the car." (Emphasis supplied.) Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999) stated clearly that an officer may search an automobile without a warrant if he has probable cause to believe it contains evidence of a crime or contraband goods.

As Maryland has regularly applied the Carroll Doctrine over the years, it has consistently recognized the dual purpose of the police search. In Nathan v. State, 370 Md. 648, 665-66, 805 A.2d 1086 (2002), the Court of Appeals stated clearly:

> Police officers who have probable cause to believe that there is contraband or other evidence of criminal activity inside an automobile that has been stopped on the road may search it without obtaining a warrant.

(Emphasis supplied.)

The thorough analysis by Judge Graeff in Bowling v. State, 227 Md. App. 460, 476, 134 A.3d 388 (2016) definitively concluded that the 2014 change in Maryland law on the possession or use of less than 10 grams of marijuana had absolutely no adverse impact on marijuana's continuing status as contraband:

> [I]t is clear that the Maryland General Assembly intended that marijuana remain classified as "contraband," and that the decriminalization of small amounts of marijuana would not affect existing case law allowing officers to search a vehicle based upon a K-9 alert to the smell of marijuana.

35

> Given this legislative history, we conclude that, although the Maryland General Assembly made possession of less than 10 grams of marijuana a civil, as opposed to a criminal, offense, <u>it is still illegal to possess any quantity of marijuana, and marijuana retains its status as contraband</u>. Accordingly, we hold that <u>this legislation does not change the established precedent that a drug dog's alert to the odor of marijuana</u>, without more, <u>provides the police with probable cause to authorize a search of a vehicle pursuant to the *Carroll* doctrine</u>. Here, Diablo's alert provided <u>a sufficient basis to believe that contraband would be found in the vehicle, and therefore, it provided probable cause to search the vehicle</u>.

(Emphasis supplied.)

In affirming <u>Bowling v. State</u>, the Court of Appeals in <u>Robinson v. State</u>, 451 Md. 94, 152 A.3d 661 (2017), was emphatic that, quite independent of any issue with respect to probable cause to believe that evidence of crime was present in a vehicle, the distinct and independent justification for a <u>Carroll</u> Doctrine search – probable cause to believe that contraband is present in the vehicle – is completely unaffected by the decriminalization of the possession of less than 10 grams of marijuana:

> [W]e hold that <u>a law enforcement officer has probable cause to search a vehicle where the law enforcement officer detects an odor of marijuana emanating from the vehicle, as marijuana in any amount remains contraband</u>, notwithstanding the decriminalization of possession of less than ten grams of marijuana; and <u>the odor of marijuana gives rise to probable cause to believe that the vehicle contains contraband</u> or evidence of a crime. Simply put, <u>decriminalization is not synonymous with legalization</u>, and <u>possession of marijuana remains unlawful</u>.

(Emphasis supplied.) 451 Md. at 99.

After reminding us that "marijuana remains contraband, which is subject to seizure," 451 Md. at 107, the Court of Appeals resoundingly reaffirmed our holding in <u>Bowling</u> that probable cause to search for contraband is a separate and independent justification for a <u>Carroll</u> Doctrine search:

The Court of Special Appeals also examined case law from the Supreme Court and other jurisdictions and concluded that <u>the automobile exception to the warrant requirement is not limited to where there is probable cause to believe there is evidence of a crime in a vehicle</u>; rather, <u>the Court of Special Appeals determined that "a search is permitted when there is probable cause to believe that the car contains evidence of a crime or contraband</u>. The Court of Special Appeals explained that <u>marijuana in any amount remains contraband</u> – i.e., goods that are unlawful to possess. As such, in <u>Bowling</u> <u>the narcotics dog's alert provided probable cause to believe that contraband would be discovered in the vehicle irrespective of the decriminalization of possession of less than ten grams of marijuana.</u>

(Emphasis supplied.) 451 Md. at 117-18.

Probable cause to search for and to seize contraband is by no means synonymous with probable cause to arrest the defendant for committing a crime:

The Supreme Court's use of the phrase "contraband or evidence of a crime" demonstrates that <u>the terms "contraband" and "evidence of a crime" have different meanings</u>. In our view, <u>"contraband" means goods that are illegal to possess, regardless of whether possession of the goods is a crime</u>. The definition of "contraband" that we adopt is warranted by the Supreme Court's conclusion in <u>Carroll</u> that <u>a law enforcement officer can search a vehicle based on probable cause to believe that the vehicle's contents are contraband, even if the law enforcement officer cannot arrest the driver.</u>

(Emphasis supplied.) 451 Md. at 128.

The standard definition of "contraband" fully supported the reasoning of the Court of Appeals:

<u>The conclusion that the terms "contraband" and "evidence of a crime" are not synonymous is supported by the plain meaning of the word "contraband."</u> Significantly, the words "crime" and "criminal" do not appear in the definitions of "contraband" in both Black's Law Dictionary and Merriam-Webster. Black's Law Dictionary defines contraband, in relevant part, as <u>"goods that are unlawful to import, export, produce, or possess."</u> Contraband, Black's Law Dictionary (10th ed. 2014). Similarly, <u>Merriam-Webster defines contraband</u>, in relevant part, as <u>"goods or merchandise whose importation, exportation, or possession is forbidden."</u> These definitions support the conclusion that <u>marijuana in any amount constitutes contraband.</u>

(Emphasis supplied.) 451 Md. at 128-29. As the Court of Appeals made clear at 451 Md. 133:

> [T]he term "contraband" includes more than items or goods that are criminal to possess, but may also include items or goods that are simply illegal to possess.

The fact that the amount of marijuana that is smelled is small has absolutely no effect on its status as contraband or on its power to generate probable cause:

> Rather than cabining our holding to the requirement that the odor must be strong or overwhelming, we conclude that the odor of marijuana provides probable cause to search a vehicle. [M]arijuana in any amount, no matter how small, is contraband; accordingly, the odor of marijuana constitutes probable cause to search a vehicle. In other words, for purposes of probable cause, there is no distinction between the significance of a criminal amount of marijuana versus the significance of a noncriminal – but still illegal – amount of marijuana.

(Emphasis supplied.) 451 Md. at 130. Robinson v. State, 451 Md. at 137, also concluded:

> [W]e hold that a law enforcement officer has probable cause to search a vehicle where the law enforcement officer detects an odor of marijuana emanating from the vehicle, as marijuana in any amount remains contraband.

(Emphasis supplied.)

Nowhere in the appellant's argument, however, is there so much as a mention of marijuana's dual identity – its identity as contraband as distinct from its identity as evidence of crime. What the appellant does not challenge would be, ipso facto, proof of the case against him.

### The Plenitude Of Probable Cause

As Chief Judge Barbera pointed out in State v. Johnson, 458 Md. 519, 535, 183 A.3d 119 (2018) (quoting District of Columbia v. Wesby, 583 U.S.__, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018)), "probable cause is not a high bar." The probable cause to justify the

warrantless <u>Carroll</u> Doctrine search of the appellant's Chevrolet Malibu in this case was, like Portia's quality of mercy, "twice blest."[9] The probable cause to search the Malibu for evidence of marijuana-related crimes was abundant. That alone satisfied the <u>Carroll</u> Doctrine. Quite independently, the probable cause to search the Malibu for any amount of contraband, to wit, any amount of marijuana, was also abundant. That alone also satisfied the <u>Carroll</u> Doctrine. In terms of the <u>Carroll</u> Doctrine's authorizing of the police warrantlessly to search a vehicle for evidence of crime or contraband, it is as if the 2014 change in the law of Maryland had never occurred. There is no way that the <u>Carroll</u> Doctrine's probable cause requirement was not satisfied in this case. It was, indeed, "twice blest."[10]

### III. The Malibu's Mobility

As a separate and distinct sub-contention, the appellant argues that the <u>Carroll</u> Doctrine was violated because the Malibu, when searched, was not sufficiently mobile to justify a warrantless search. Curiously, he constructs this sub-contention completely on the authority of the Supreme Court opinion of <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 458-63, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) and a very early decision of this Court, <u>Humphrey v. State</u>, 39 Md. App. 484, 386 A.2d 1238 (1978), that expressly followed <u>Coolidge</u>.

Our first and immediate response is to dispose of <u>Coolidge v. New Hampshire</u> summarily. If it were necessary to do so, we would not hesitate to distinguish this case

---

[9]     William Shakespeare, <u>The Merchant Of Venice</u>, Act 4, Scene 1.

[10]     Indeed, the appellant never expressly challenged the existence of probable cause to conduct a <u>Carroll</u> Doctrine search of the Malibu for contraband.

from <u>Coolidge</u> in half a dozen ways. It is not necessary to do so, however, and this opinion is already unduly long.

What the appellant gives us from <u>Coolidge</u> is not in any way authoritatively binding Supreme Court law. It is simply a part of Justice Stewart's plurality opinion, Part II B at 403 U.S. 458-63. <u>Coolidge</u> is, to be sure, a tangled labyrinth of overlapping plurality, concurring, and dissenting opinions in the course of six written opinions. That is why it must be approached sensitively. Justice Stewart's discussion of the <u>Carroll</u> Doctrine garnered four votes, his own and those of Justices Brennan, Marshall, and Douglas. Indeed, the <u>Coolidge</u> opinion itself formally acknowledged this less than binding status of Part II-B of the plurality opinion. "Parts II-A, II-B, and II-C of this opinion are joined only by Mr. Justice Douglas, Mr. Justice Brennan, Mr. Justice Marshall." 403 U.S. at 445, n.**.

In <u>Humphrey v. State</u>, Judge Morton's opinion for this Court relied directly on that plurality opinion. "In this factual posture we are persuaded that the reasoning employed by Justice Stewart in <u>Coolidge v. New Hampshire</u> is also appropriate to the case <u>sub judice</u>." The <u>Humphrey</u> opinion then went on to quote 18 lines of the <u>Coolidge</u> plurality opinion verbatim. 39 Md. App. at 493. The <u>Humphrey</u> rationale was based exclusively on <u>Coolidge</u>.

The appellant has cited not a single case other than <u>Coolidge</u> and <u>Humphrey</u> where the <u>Carroll</u> Doctrine was held to have been violated because of the alleged non-mobility of the searched vehicle. Under the circumstances, we decline to indulge this sub-contention further.[11]

---

[11]     We breach our resolution not to indulge this sub-contention further only to cite <u>Bell v. State</u>, 96 Md. App. 46, 54, 623 A.2d 690 (1993):

40

## IV. The Special Problem Of Scope

In his third and final sub-contention, the appellant raises the issue of scope. The prime directive of the Fourth Amendment is that no search or seizure must ever be excessive in scope. As we implement that prime directive, our guiding principle is:

**THE PERMITTED SCOPE OF ANY SEARCH IS WHATEVER IS NECESSARY TO SERVE THE PURPOSE OF THAT SEARCH – BUT NOTHING MORE.**

The appellant contends that once the police in this case discovered 52 grams of marijuana along with a digital scale under the driver's seat of the appellant's Malibu, they had completely served the purpose of their Carroll Doctrine search and they were obligated, at that point, to terminate the search. The continuing search that produced the ammunition, the appellant contends, was therefore excessive in scope and should have compelled the suppression of the ammunition. The appellant misreads our guiding principle.

In order to determine what is necessary to serve the purpose of a search, one must first identify the purpose of the search. In the context of the Carroll Doctrine, it is the object of the phrase "probable cause to believe" that defines the purpose of the permitted search.

---

A parked car containing possible narcotics in a zone of high narcotics activity was a goose waiting to be plucked. At the very least, it was a repository of possible inculpatory evidence that would have been long gone before the police team could secure a search warrant.

(Emphasis supplied.) The Malibu was abandoned by the appellant on Lamplighter Ridge, an area that was described by Detective Clarke as being a "high-crime drug area" consisting of townhouses. The detective explained that the police "receive several CDS complaints on a daily basis" from residents and community managers. In terms of its exigent vulnerability, the Malibu was, indeed, "a goose waiting to be plucked."

If there is probable cause to believe that certain "evidence of crime" or a certain type of "contraband" is somewhere in the vehicle, the police are permitted to search anywhere in the vehicle that such "evidence of crime" or such "contraband" might be found including a locked trunk. The ever-present constraint is, "But don't look anywhere else." If looking for a stolen diamond ring, look everywhere. If searching an automobile for stolen truck tires, on the other hand, look everywhere that such truck tires could be, but don't look in the glove compartment. A ready guideline that we commend for general use would be: **DON'T LOOK FOR AN ELEPHANT IN A MATCHBOX.** Looking in the glove compartment would be, by definition, excessive in scope because it would have been more than was necessary to serve the purpose of that search, to wit, the search for an elephant.

As the appellant here misreads those general guidelines, his self-serving version of the applicable constraints seems to be, "If you have probable cause to search the Malibu for marijuana, once you find some, be satisfied. Terminate the search and do not look for more." There is, however, no such constraint. The purpose of a given search is to find **ALL** of a sought-after object, not merely **SOME** of it. If the object of the search is marijuana, the police may continue to search any part of the vehicle, including a locked trunk, where even more marijuana might be hidden. The permitted purpose of the <u>Carroll</u> Doctrine search is to recover all of the designated evidence of crime and all of the designated contraband that is probably to be found somewhere in that vehicle. As the Supreme Court pointed out in <u>Wyoming v. Houghton</u>, 526 U.S. 295, 301, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999):

42

> If probable cause justifies the search of a lawfully stopped vehicle, <u>it justifies the search of every part of the vehicle</u> and its contents <u>that may conceal the object of the search</u>.

(Emphasis supplied.) *See also* <u>United States v. Ross</u>, 456 U.S. 798, 825, 102 S. Ct. 2157, 72 L.Ed.2d 572 (1982).

The appellant seeks misguided solace in two cases: 1) <u>Bell v. State</u>, 96 Md. App. 46, 623 A.2d 690 (1993), affirmed by <u>State v. Bell</u>, 334 Md. 178, 638 A.2d 107 (1994) from Maryland, and 2) <u>California v. Acevedo</u>, 500 U.S. 565, 111 S. Ct. 1982, 114 L.Ed.2d 619 (1991) from the Supreme Court. Neither, however, serves the appellant's purpose.

## A. <u>Bell v. State</u>

In <u>Bell v. State</u>, 96 Md. App. at 53-54, the police developed good probable cause to make a warrantless search of the appellant's vehicle for a single white vial containing white powder. The Court of Special Appeals described the limited scope of the search that was permitted:

> <u>We have no difficulty upholding the initial and limited police entry into the automobile to retrieve the vial containing white powder. It was</u> investigative in nature and was <u>based upon probable cause.</u>

96 Md. App. at 53. (Emphasis supplied.) The probable cause that focused on the single white vial was described by this Court:

> Ten minutes later, <u>the appellant was</u> again observed <u>standing beside the open passenger door</u>. On that occasion, <u>he dropped what appeared to be "a vial, a white object" into the window opening. Looking through the transparent window</u> of the automobile, as was their right, <u>the police observed on the floor a vial containing white powder. It was inside the window where the appellant had just been seen throwing something in.</u>

43

96 Md. App. at 53. (Emphasis supplied.) This Court made very clear the limited nature of

the Carroll Doctrine search that was permitted:

> Under the totality of the circumstances, the police had, we hold, the necessary probable cause required by the Carroll Doctrine to justify a warrantless entry into the automobile for the specific purpose of retrieving the vial of suspected cocaine.

96 Md. App. at 54. (Emphasis supplied.)

Having fully served the purpose of that limited search, the obligation on the police

was then to terminate the search and to go no further:

> What followed that limited seizure was beyond the permitted scope of this particular "automobile exception" entry. The permitted scope of a Carroll Doctrine search, of course, is whatever is necessary to serve the purpose of that particular search. The only probable cause asserted by the police was probable cause to believe that the single vial observed lying on the floor in front of the passenger seat contained contraband narcotics. Accordingly, the automobile was warrantlessly entered and that vial was retrieved. At that point, the entire purpose that justified the warrantless entry in the first place had been fulfilled. The police obligation, therefore, was to terminate the search, its purpose already having been fully served. The Carroll Doctrine does not permit further and gratuitous rummaging about.

96 Md. App. at 54. (Emphasis supplied.)

It was the clear opinion of this Court that the warrantless search should have stopped

at that point. The police had recovered not one white vial out of possibly many white vials,

but the only white vial that had ever figured in this case. It was **THE** white vial that the

police had seen being dropped in the car through the window. It was **THE** white vial the

police had observed on the floor of the car. It was **THE** white vial that was the sum total

of the probable cause to search the car. The purpose of that particular Carroll Doctrine

search had self-evidently been fully and completely served. Nothing else was needed. What

44

followed, a badly entangled inventory search analysis, is not pertinent to our present analysis.

On certiorari review, the Court of Appeals agreed that the Court of Special Appeals had been correct in holding that the probable cause established by the police had been limited to the single vial observed on the floor of the car:

> As the Court of Special Appeals noted in the instant case, the only probable cause asserted by police was probable cause to believe that the single vial observed on the floor of the car contained contraband narcotics. Thus, we can find no error in that court's limitation of the first Carroll doctrine search to the seizure of a single vial.

334 Md. at 186. (Emphasis supplied.)

The combined opinions of the Court of Appeals and the Court of Special Appeals in this Bell case, we should note, are treacherous waters and the prudent reader should be leery about lingering too long in them. There are dangerous rip currents veering off in unanticipated directions. The initial problem, before it metamorphosed, was that the State broke down what should have been a single automobile search into two distinct parts, with a separate rationale offered to support each part. The Court did not mandate such a separation. It simply accepted it and proceeded from there. A first Carroll Doctrine search, aimed at retrieving a single vial of white powder, first metamorphosed into probable cause to support a warrantless arrest and then, secondly, into a post-arrest inventory search of the automobile. More than half of the opinion was spent on rejecting the State's reliance on an inventory search. None of this is remotely pertinent to the present case.

A theory that might have had some pertinence to the present case was never considered by either Court because it had not been properly preserved for appellate review.

45

The Court of Special Appeals referred to it in passing as a hypothetical possibility in some future case but something that was not before the Court in the Bell case:

> Although an argument might someday be made for extending a search such as this based upon some almost Newtonian proposition that the discovery of some contraband suggests the likely presence of more contraband yet to be discovered, it is enough to note that no such argument was made by the State in this case, either at the suppression hearing or before us.

96 Md. App. at 55. (Emphasis supplied.)

Such a hypothesis is that the search might go on as one continuous search. The only recovery of additional evidence or contraband that was ever made in the Bell case was not made, as with the ammunition here, in the course of some continuing Carroll Doctrine search but it was one made in the course of an inventory of the contents of the car following the arrest of the driver and prior to the impounding of his car. There is absolutely nothing in the holding of the Bell case or in the facts even remotely pertinent to the case now before us.

Our only purpose in analyzing the Bell opinion to the extent we have done so is to negate the appellant's erroneous reliance on a truncated section of the opinion. What that truncated reliance by the appellant here does is to try to impose the limited observations of the Court with respect to the first of two distinct searches as an imagined holding on a purely hypothetical second of two distinct searches, a proposition that neither Court ever considered because it had not been properly preserved for appellate review. The appellant has presumed to make for both appellate courts a conclusion as to the effect that our observations as to the first search might have had on the hypothetical second search, a

46

holding that each appellate court expressly declined to consider. As to that first of the searches, the Court of Appeals agreed with the Court of Special Appeals:

> <u>Given the fact that the two searches were distinct, the Court of Special Appeals was entirely correct</u> in determining <u>that the first search was complete upon the seizure of the single vial</u>.

334 Md. at 185. (Emphasis supplied.) All of which, without any consideration of the hypothetical second search, gets the appellant nowhere. Neither Court in <u>Bell</u> even considered the proposition that the State should not have broken the search of the automobile down into two distinct and separate segments. Neither Court even considered the possibility that what was recovered in the first search might have constituted probable cause for a second search. Such a second search never took place. That issue was simply not before either court.

With respect to the source of the energizing probable cause, moreover, in the <u>Bell</u> case it was a solitary, easily identifiable, three-dimensional concrete object and not the more generalized and pervasive presence of an unquantifiable amount of marijuana. To recover all of the first is not comparable to recovering all of the second.

## B. <u>California v. Acevedo</u>

The second and only other ostensible authority relied upon by the appellant in this regard is <u>California v. Acevedo</u>, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). For the purpose for which the appellant cites it, <u>California v. Acevedo</u> is of absolutely no pertinence. The full focus of the Supreme Court's analysis was on the <u>searchability</u> of a single paper bag placed in the trunk of an automobile, not upon the <u>non-searchability</u> of the rest of the car, the manufactured proposition on which this appellant totally relies. Any

47

mention of the rest of the car was uncontroversial and was mentioned only in passing. The full focus of the Supreme Court's four opinions was on the change in the law that the Court was making therein, recognizing the influence of United States v. Ross, 456 U.S. 798, 102 S. Ct. 2157, 72 L.Ed.2d 572 (1982) and then reversing its own earlier reliance on United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), as those cases too strictly inhibited the warrantless searches of suitcases and other containers. None of that is at all pertinent to the issue for which the appellant is citing Acevedo.

In Acevedo, federal narcotics agents were on the trail of a shipment of marijuana that had arrived in the United States from Hawaii. Acevedo's car, parked outside of an apartment that was under surveillance, was not the focus of any investigative attention. The exclusive focus was on a brown paper bag that was observed being carried out of the apartment and placed in the trunk of Acevedo's car:

> At 12:30 P.M., respondent Charles Steven Acevedo arrived. He entered Daza's apartment, stayed for about 10 minutes, and reappeared carrying a brown paper bag that looked full. The officers noticed that the bag was the size of one of the wrapped marijuana packages sent from Hawaii. Acevedo walked to a silver Honda in the parking lot. He placed the bag in the trunk of the car and started to drive away. Fearing the loss of evidence, officers in a marked police car stopped him. They opened the trunk and the bag, and found marijuana.

500 U.S. at 567. (Emphasis supplied.)

The probable cause was focused completely on the brown paper bag and not upon Acevedo's car. As a result, the warrantless search of the bag, as a container search, could not rely on the Carroll Doctrine but had to rely on the then binding precedent of United States v. Chadwick:

48

The court concluded that <u>the officers had probable cause to believe that the paper bag contained drugs but lacked probable cause to suspect that Acevedo's car, itself, otherwise contained contraband</u>. Because <u>the officers' probable cause was directed specifically at the bag</u>, the court held that the case was controlled by <u>United States v. Chadwick</u> rather than by <u>United States v. Ross</u>. Although <u>the court agreed that the officers could seize the paper bag</u>, it held that, under <u>Chadwick</u>, they could not open the bag without first obtaining a warrant for that purpose. The court then recognized "the anomalous nature" of the dichotomy between the rule in <u>Chadwick</u> and the rule in <u>Ross</u>. That dichotomy dictates that <u>if there is probable cause to search a car, then the entire car</u> – including any closed container found therein – <u>may be searched without a warrant</u>, but <u>if there is probable cause only as to a container in the car, the container may be held but not searched until a warrant is obtained</u>.

500 U.S. at 568. (Emphasis supplied.)

The great bulk of the Supreme Court's opinion focused on what became the Court's retreat from the harshness of its former holding in <u>Chadwick</u>. The reference to the absence of any probable cause to search the rest of Acevedo's car was made completely in passing. Nothing in the <u>Acevedo</u> opinion itself had anything remotely to do with this appellant's proffered principle that a good <u>Carroll</u> Doctrine search for some marijuana at its inception must terminate once it has discovered some marijuana, lest the continuing search be deemed to be excessive in scope. The appellant does not even argue the point to the contrary or grace us with so much as a single argument found in or a single quotation from <u>Acevedo</u>. It simply cites <u>State v. Bell</u>, 334 Md. at 186-86, and relies on the fact that the <u>Bell</u> opinion made mention of <u>Acevedo</u>.

## C. Citing Authority Versus Cherry Picking

In terms of their ultimate holdings, neither <u>Bell</u> nor <u>Acevedo</u> dealt with anything remotely pertinent to the issue the appellant raises here. The scope issue raised by the appellant involves an initial <u>Carroll</u> Doctrine search, the one here that found 52 grams of

49

marijuana underneath the driver's seat, and then the critical question of whether the <u>Carroll</u> Doctrine search might continue after that point. Neither <u>Bell</u> nor <u>Acevedo</u> involved any such continuing <u>Carroll</u> Doctrine search. In <u>Bell</u>, the issue was whether the probable cause that supported the initial automobile search could also justify a warrantless arrest of the defendant and, if so, whether the impounding and the inventorying of the driver's car could validly follow. In <u>Acevedo</u>, there was no secondary or continuing search of any sort. The issue was that of whether the single search of the brown paper bag in the trunk of Acevedo's car, which under the then-prevailing rule of <u>United States v. Chadwick</u> could not be searched warrantlessly in its capacity as a container, could have been searched warrantlessly under the <u>Carroll</u> Doctrine because, at the time of the search, it was sitting inside an automobile. Neither the holding of <u>Bell</u> nor that of <u>Acevedo</u>, therefore, has any remote pertinence to the continuing search issue here being raised by the appellant.

With respect to <u>stare decisis</u>, moreover, it is holdings that matter, not random language. In neither case does the appellant cite <u>Bell</u> or <u>Acevedo</u> for their actual holdings. That, of course, would engage the authoritative gears of <u>stare decisis</u>. The appellant simply cherry-picks random sentences and observations from those cases. The appellant then uses that cherry-picked material to support propositions of his own creation although that material was not used to support such propositions in their original settings. At the very least, this represents a reliance on ostensible but dubious authority that should cause the prudent reader to tread with extreme caution. *See* <u>State v. Wilson</u>, 106 Md. App. 24, 39, 664 A.2d. 1 (1995) ("[S]tare decisis is ill served if readers hang slavishly on every casual or hurried word as if it had bubbled from the earth at Delphi").

50

### D. White Vials And Brown Paper Bags As Specific Targets

In any event, the probable cause in <u>Bell</u> was focused exclusively on the vial of white powder that was dropped through the window and was then observed on the floor of the car. Once it was found and seized, the purpose of that search had been fully served and should then have terminated. In sharp contrast, the probable cause in the present case was that marijuana was somewhere in the Malibu. The service of that purpose would not have been fully served until the entire car, including the trunk, had been searched for any amount of marijuana that could be found.

The analysis would be precisely the same with respect to the brown paper bag in <u>Acevedo</u>. The probable cause in that case had never focused on anything other than that brown paper bag. Its recovery completely served the purpose of the police entry into the trunk of the car. There was nothing else to look for. In the present case, by contrast, there was still more marijuana to look for. Neither <u>Bell</u> nor <u>Acevedo</u> remotely suggest that in this case there was not a purpose of the search yet being served.

### E. The Purpose Was Also To Search For Contraband

In grasping for a rationale to support a non-existent scope limitation, the appellant conveniently forgets the dual character of marijuana as not only evidence of crime but also as contraband. The purpose of a search for contraband is to find it, to seize it, and to confiscate it. That obviously means **ALL** of it that can be found anywhere in the searched automobile, not simply **SOME** of it that already has been found. The purpose is to find it all, not to find some of it. It is, moreover, a truism that more contraband may be present than was initially suspected. In this case, the ammunition was not found after the search

51

for marijuana had been finished and terminated. It was found as the search for more marijuana continued. Why, for instance, would a search bent on the confiscation of contraband marijuana not wish to find and confiscate all of the marijuana? It would so wish. A search for contraband will not be consummated by a guilty verdict at a criminal trial. A search for contraband pursues the very different purpose of confiscating all of a forbidden product. That purpose of the search for marijuana as contraband was, therefore, still being served when the ammunition was found. It was within its permitted scope.

## F. "Mission Accomplished" Or "Mission Still In Progress"

When the <u>Carroll</u> Doctrine search of the Malibu first recovered marijuana from underneath the driver's seat, were the police entitled at that point to go on and look under the driver's side panel, where the ammunition was recovered? Or with the initial discovery of **SOME** marijuana, had the energizing purpose of the <u>Carroll</u> Doctrine search been so fully and completely accomplished that any further searching amounted to nothing more than gratuitous rummaging about? It has been the burden of this opinion that the search of the Malibu remained legitimately in progress. The inquiry, however, raises an interesting question.

In terms of what it takes to serve completely and definitively the purpose of a search, it is obviously easier for the police to search for and find a single and specifically described physical object than it is for the police to search a more generalized and non-specific ambience for the non-quantifiable source (or sources) of the smell of marijuana. The seizure of <u>Bell's</u> single vial containing white powder or of <u>Acevedo's</u> single brown paper bag obviously represented some sort of <u>fait accompli</u> that the discovery of some, but not

52

necessarily all, of the aroma-producing marijuana did not. The appellant's argument has been to analogize the one to the other. Our sub-holding in this regard is that the analogy is inapt.

In <u>Bell</u> the police had found all of the white vial there was to be found. In <u>Acevedo</u> the police had found all of the brown paper bag that was to be found. In this case, they had not yet found all of the marijuana that was to be found. The investigative search in this case remained in constitutional progress until the search for any possibly remaining marijuana had been completed. It was from start to finish a constitutional <u>Carroll</u> Doctrine search. There was no scope violation.

## V. Conclusion

We conclude as we began. This appellant's omnibus contention and numerous sub-contentions to the contrary notwithstanding, the <u>Carroll</u> Doctrine's status as a well-settled exception to the Fourth Amendment's warrant requirement is alive and well.[12]


**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

[12]    *See also* Moylan, "The Automobile Exception: What It Is And What It Is Not – A Rationale In Search Of A Clearer Label," 27 <u>Mercer L. Rev.</u> 987 (1976).